**IN THE UNITED STATED DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JEFFREY MICHNE AND KELLEIGH MCKENZIE,<br><br>                Plaintiffs,<br><br>      v.<br><br>PRESTIGE OF RAMSEY, INC., a/k/a PRESTIGE LEXUS OF RAMSEY, INC., PRESTIGE LEXUS, PRESTIGE LEXUS OF RAMSEY; PRESTIGE MANAGEMENT SERVICES, INC.; DEAN KREISMER; DONASON DENDRICKSON; COLLEEN MCMASTER; ABC CORPORATIONS 1-10 (fictitious designations); and JOHN DOES 1-10 (fictitious designations),<br><br>                Defendants. | CIVIL ACTION<br><br>Docket No. 2:16-CV-01393-SRC-CLW |

---

**BRIEF IN SUPPORT OF MOTION TO SET A REASONABLE FEE ON SETTLEMENT PROCEEDS IN EXCESS OF TWO MILLION DOLLARS**

---

STARK & STARK
Princeton Pike Corporate Center
993 Lenox Drive, Building 2
P.O. Box 5315
Princeton, NJ  08543-5315
(609) 896-9060
Attorneys for Plaintiffs

On the Brief and Of Counsel:
JOHN A. SAKSON, ESQ.
BRYAN M. ROBERTS, ESQ.

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................................... ii

TABLE OF AUTHORITIES .............................................................................. iii

INTRODUCTION ...............................................................................................1

STATEMENT OF FACTS ..................................................................................1

ARGUMENT ......................................................................................................6

Factor 1: The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly ..............10

Factor 2: The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer .............................14

Factor 3: The fee customarily charged in the locality for similar legal services .................15

Factor 4: The amount involved and the results obtained........................................................17

Factor 5: The time limitations imposed by the client or by the circumstances....................17

Factor 6: The nature and length of the professional relationship with the client.................17

Factor 7: The experience, reputation, and ability of the lawyer or lawyers performing the services ........................................................................................................17

Factor 8: Whether the fee is fixed or contingent.................................................................18

CONCLUSION .......................................................................................................18

4813-4882-6234, v. 1

# TABLE OF AUTHORITIES

## CASES

Chin v. DaimlerChrysler Corp., 461 F. Supp. 2d 279, 283 (D.N.J. 2006) ...................................7

King v. County of Gloucester, 483 F. Supp. 2d 396 (D.N.J. 2007) .....................................7, 8, 9

In re Estate of F.W., 398 N.J. Super. 344 (App. Div. 2008) ................................................7, 8, 9

## RULES & STATUTES

New Jersey Rules of Court 1:21-7(c)(5) .............................................................................1, 7, 8

New Jersey Rules of Court 1:21-7(f).................................................................................1, 7, 8

Loc. Fed. Civ. R. 54.2 ..........................................................................................................6

N.J. R.P.C. 1.5 .....................................................................................................................9

## INTRODUCTION

This application is made to set a reasonable fee on net settlement proceeds in excess of two million dollars and is required by the Agreement to Provide Legal Services (incorporating by reference New Jersey Rules of Court  1:21-7(c)(5) and 1:21-7(f)) between Stark & Stark, P.C. and the plaintiff. The amount of the settlement is contained in the sealed Certification of Bryan M. Roberts, Esquire.

## STATEMENT OF FACTS

This is a case about a car dealership, Defendant, Prestige Lexus of Ramsey ("Prestige Lexus"), that did not train its mechanic, Defendant, Dean Kreismer, on the proper method for reinstalling a wheel and tire assembly on a Lexus sedan and did not supervise his work.  As a result of Prestige Lexus's bad decisions, the left front tire and wheel assembly of Defendant Colleen McMaster's Lexus E350 sedan detached at high speed, rocketed down a busy highway, penetrated the front windshield of a commuter bus and struck Plaintiff, Jeffrey Michne ("Jeff"), in the face.  Jeff suffered catastrophic brain damage from the impact between the 47 pound, fast-moving wheel and tire assembly and his face.  This preventable incident changed the lives of Jeff, and his devoted wife and caregiver, Kelleigh McKenzie ("Kelleigh"), forever.

### Liability

A wheel and tire assembly does not detach from a freshly serviced vehicle unless the lug nuts are improperly tightened when the wheel and tire assemblies are reinstalled.  The undisputed evidence shows that the lug nuts on the front left and right wheels of the McMaster's vehicle were under tightened.

Prestige Lexus changed the McMaster vehicle's oil and replaced a taillight, on April 30, 2014.  Prestige recommended that Ms. McMaster replace her front brakes during her April 30th

1

visit. Ms. McMaster returned to the dealership on May 2, 2014 to have her front brake pads replaced and her front brake rotors resurfaced. Ms. McMaster opted to wait for her vehicle at Prestige Lexus while it was being serviced.

Michael Ceccon has been Prestige Lexus's Part and Service Director since 1997 and, from 1990 through 1996, he was a service technician at the dealership. In his 30(b)(6) deposition from a companion case, Prestige Lexus's Parts and Service Director testified that the proper technique for the dealership's mechanics to install a wheel and tire assembly is to use a torque stick to preliminarily tighten the lug nuts. To accomplish the final tightening of the lug nuts, the mechanic must use a torque wrench, which makes an audible click or beep when the proper torque is achieved. Prestige did not require its mechanics to document whether or not they actually used a torque wrench or the torque setting on the wrench, if one was used, when installing wheel and tire assemblies on a vehicle.

While Ms. McMaster waited, Prestige Lexus's mechanic removed the front wheel and tire assemblies of the Lexus, in order to replace the front brake pads and resurface the front brake rotors. Upon completing the pads and rotors, the Prestige Lexus mechanic reinstalled the left and right front wheel assemblies. The Prestige Lexus mechanic used a torque stick and impact gun to tighten the lug nuts on the Lexus sedan, not a torque wrench. He relied on his "experience" in his attempt to reach the proper torque of the lug nuts, not an audible alert from a torque wrench. Prestige Lexus did not have anyone check the mechanic's work to ensure that the wheel and tire assemblies were properly tightened.

On the morning of May 5, 2014, Ms. McMaster was driving to work when she heard a noise after applying the brake. She decided to drive directly to Prestige Lexus. While travelling at 35 mph on Route 17, the left front wheel and tire assembly detached from the McMaster

2

vehicle.  The detachment occurred approximately 10-15 minutes after Ms. McMaster heard the noise and just before she reached Prestige Lexus.

The 47 pound wheel and tire assembly flew off of the vehicle "like a rocket," and launched down the roadway.  The 47 pound wheel and tire assembly hit the Jersey barrier, became airborne, penetrated the front windshield of a commuter bus travelling in the opposite direction on the roadway and struck Jeff in the face.  At the time of incident, Jeff was headed to work at the law firm of Sullivan & Cromwell in New York City where he was the Co-Director of the Electronic Discovery and Litigation Support Department.

According to R. Scott King, a mechanical engineer with 17 years' experience as an automobile mechanic, the process of wheel and tire assembly loosening and detachment is progressive.  The McMaster Lexus travelled approximately 232 miles from the time of service at Prestige Lexus until the detachment.  Based upon his training and experience, this distance is consistent with a progressive loosening and detachment due to under tightened lug nuts.

A post-detachment inspection requested by Ramsey Police Department Detective Brad Smith, and conducted by Borough of Ramsey Department of Public Works Mechanic Richard Malestein, revealed that the lug nuts on the right front wheel assembly were also under tightened. The mechanic was able to break a lug nut loose on the right front wheel and tire assembly with "very little effort" using a 10" socket wrench, which indicates that the lug nuts were under tightened.  Subsequent measurements of the torque values on the right front lug nuts revealed under tightening.  An inspection of the torque values on the left and right rear wheel lug nuts, which were not removed by Prestige Lexus, showed that they were properly tightened.  Liability was vigorously defended and the defendants do not admit the plaintiffs' allegations.

## Injuries

Jeff was removed from the commuter bus and treated by Advanced Life Support paramedics.  Jeff had numerous facial fractures and facial and head lacerations.  He was combative and had a Glasgow Coma Scale of 8.  Jeff was intubated and immediately transported by medical helicopter to St. Joseph's Hospital where he was admitted to the Surgical Intensive Care Unit.  His Glasgow Coma Scale dropped to 6 and then 3.  Jeff underwent surgery to repair the lacerations on his face and head.  Imaging revealed that Jeff suffered fractures of the posterior wall of the left maxillary sinus with depression, the left maxilla, the anterior wall of the left maxillary sinus and multiple fractures of the left zygomatic arch and petrous temporal bone.

Most significantly, Jeff suffered a devastating diffuse axonal traumatic brain injury.  Imaging revealed that the impact with the 47 pound tire and wheel assembly caused petechial hemorrhages in the bifrontal lobes, left frontal and parietal lobe petechial hemorrhages and axonal shearing, and left temporal and right occipital lobe petechial hemorrhages.

On May 12, 2014, Jeff was transferred from St. Joseph's Hospital to Helen Hayes Hospital, a brain injury rehabilitation center, where he spent an additional 17 days.  From Helen Hayes Hospital, Jeff came under the care of the world renowned brain injury rehabilitation specialist and Chair of the NYU Langone Rusk Institute of Rehabilitation Medicine, Dr. Steven Flanagan.  Pursuant to the recommendations of Dr. Flanagan and his colleagues at NYU, Jeff has endured several rounds of vestibular, vision, cognitive, occupational, speech and psychological therapies.

Dr. Wayne Gordon, a psychologist in the Department of Rehabilitation Medicine at the Mount Sinai Hospital, performed a neuropsychological examination on Jeff over 3 days in July of 2015.  The testing revealed that Jeff has deficits in multiple areas of cognitive function and

4

depression as a result of the brain injury.  Specifically, Jeff exhibited deficiencies in intellectual function, memory, executive function, motor speed, information processing speed and verbal linguistic function.  Dr. Gordon noted that the findings from his examination were very similar to the findings of the June through July, 2014 neuropsychological examination completed at the Rusk Institute of Rehabilitation Medicine.  Consequently, Dr. Gordon concluded that Jeff's neuropsychological function had stabilized and that he was permanently compromised.  Dr. Gordon further opined that Jeff is totally disabled and unable to return to work in any capacity due to his neuropsychological deficits resulting from the brain injury.  Notably, the Defense Medical Expert noted that his neuropsychological examination of Jeff in 2018 produced similar results to Dr. Gordon's 2015 test.

### Damages – Economic

Jeff began his career at the venerable law firm of Sullivan & Cromwell in 1990, as a temporary paralegal.  He was formally hired at the firm as a paralegal in 1992.  Jeff frequently worked with the firm's Litigation Support Department and he was eventually hired into the department.  Jeff continued to rise at Sullivan & Cromwell and, in 2008, he was promoted to the position of Co-Director of the Electronic Discovery and Litigation Support Department.  Jeff thrived in Sullivan & Cromwell's highly competitive environment where he concurrently managed multiple, complex tasks and communicated with lawyers, clients and staff.  At the time of his brain injury, Jeff had worked for Sullivan & Cromwell for 24 years.

Jeff was earning a significant amount of money in salary and benefits when he suffered the disabling brain injury.  The present value of Jeff's economic loss from the date of injury until the end of his work-life capacity was $6,044,631.

4813-4882-6234, v. 1

Dr. Harvey Jacobs, a psychologist and Certified Life Care Planner, performed a comprehensive review of Jeff's medical treatment, spent time with Jeff and Kelleigh at their home and consulted with Jeff's treating doctors.  Based upon the information that he collected, Dr. Jacobs developed a Life Care Plan that will help Jeff get as close as possible to the life that he had before the injury and provide for the costs of future medical treatment, medication, therapies and services.  The present value of Dr. Jacobs' Life Care Plan was $1,998,287.00.

Jeff's Long Term Disability insurer, Cigna, was asserting a lien in the amount of $358,393.90.  Jeff's automobile insurance company, Safeco, was asserting a lien to recover New York APIP benefits paid in the amount of $136,476.14.

The present value of Jeff's total, boardable economic damages was $8,537,788.04.

### Damages - Noneconomic

Jeff's economic losses are minimal as compared to his noneconomic damages.  Put simply by Jeff himself, "life is effortful."  Jeff's most basic life functions have become confusing and exhausting, while others have become impossible altogether.  Jeff has lost his independence and his self-worth.  He is isolated, embarrassed and afraid.  His work, which gave him so much pride, and his ability to provide for Kelleigh, has been stolen.  His hobbies have become reminders of what he once was or what he has lost.  Jeff was defined by what he loved to do. What Jeff loved to do is who he was.  When Jeff was robbed of what he loved to do, he was robbed of who he was.

### ARGUMENT

Pursuant to Local Civil Rule 54.2, "[i]n all actions in which a counsel fee is allowed by the Court or permitted by statute," the attorney seeking compensation for services and reimbursement for necessary expenses must make an application to the Court for same.  In some

cases, such as this one, the applicable statute is a state statute. See <u>N.J. Court R.</u> 1:21-7(f); <u>Chin v. DaimlerChrysler Corp.</u>, 461 F. Supp. 2d 279, 283 (D.N.J. 2006).  In this case, the entitlement to attorney's fees and costs is based on New Jersey state law. <u>Ibid.</u>  Therefore, the method of calculating the fees and costs is a matter of state substantive law, and state court rules (<u>N.J. Court R.</u> 1:21-7(f)) applies to the award. <u>King v. County of Gloucester</u>, 483 F. Supp. 2d 396 (D.N.J. 2007).

The Agreement to Provide Legal Services between the law firm and Jeffrey Michne and Kelleigh McKenzie, provided for a contingent fee. **(See Agreement to Provide Legal Services, attached hereto as Exhibit "A.")** Contingent fees in New Jersey personal injury tort cases are controlled, through incorporation within the Fee Agreement, by <u>New Jersey Court Rule</u> 1:21-7. At the time that the parties entered into the Fee Agreement, the Rule required an application to the Court for a reasonable fee on the amount of a recovery in excess of $2,000,000.00 because a fee on that part of a recovery is not prescribed by a fixed schedule.[1] <u>In re Estate of F.W.</u>, 398 N. J. Super 344 (App. Div. 2008).

<u>R.</u> 1:21-7(c) holds in pertinent part:

> **(c)** In any matter where a client's claim for damages is based upon the alleged tortious conduct of another, including products liability claims and claims among family members that are subject to Part V of these Rules but excluding statutorily based discrimination and employment claims, and the client is not a subrogee, an attorney shall not contract for, charge, or collect a contingent fee in excess of the following limits:
>
> (1) 33 1/3 % on the first $500,000 recovered;
> (2) 30% on the next $500,000 recovered;
> (3) 25% on the next $500,000 recovered;
> (4) 20% on the next $500,000 recovered; and
> (5) on all amounts recovered in excess of the above by application

---

[1] On July 22, 2014, the Rule was amended and the contingency fee increments were changed from $500,000 to $750,000.  This amendment became effective on September 1, 2014.

4813-4882-6234, v. 1

> for reasonable fee in accordance with the provisions of paragraph (f) hereof;

The referenced paragraph, <u>Rule</u> 1:21-7(f), holds:

> If at the conclusion of a matter an attorney considers the fee permitted by paragraph (c) to be inadequate, an application on written notice to the client may be made to the Assignment Judge for the hearing and determining of a reasonable fee in light of all the circumstances. A copy of any such application and of all papers filed in support of or in opposition thereto, together with a copy of the court order fixing the fee shall be filed with the Administrative Office of the Courts. This rule shall not preclude the exercise of a client's existing right to a court review of the reasonableness of an attorney's fee.

An application for a fee on the amount of recovery in excess of $2,000,000.00 does not require a showing that the fee on the first $2,000,000.00 is inadequate. <u>In Re Estate of F.W.</u>, <u>supra</u>. <u>R.</u> 1:21-7(c)(5) contemplates that a reasonable fee be awarded on the amount exceeding $2,000,000.00. <u>In Re Estate of F.W.</u>, <u>supra</u>.

In <u>King v. County of Gloucester</u>, 483 F. Supp. 2d 396 (D.N.J. 2007), the plaintiff's attorney applied to the Court to set attorney's fees at 33 1/3% of the net recovery over and above $2 million. The Court found the fee to be reasonable and granted it. <u>Id.</u> at 400. The Court reasoned that the case was no "run of the mill" case. The lawsuit was vigorously defended. The plaintiff's attorneys conducted substantial pre-litigation investigation, took and attended numerous depositions, attended numerous court-ordered discovery and settlement conferences, conducted inspections of the premises involved in the case (a jail), obtained and reviewed voluminous relevant records, and retained five expert witnesses. <u>Id.</u> at 398.

Similarly, the instant matter was no run of the mill case. It involved complex issues of liability, causation and damages and required an incredible amount of time and effort by Plaintiffs' counsel and Stark & Stark, P.C. The difference, however, between these cases is that

while both required herculean efforts by counsel, in this case the fee sought is only 20%, as compared to the 33 1/3% fee sought and granted in King, supra.

In considering a fee application, the court should rely upon the Rules of Professional Conduct which address the issue of "Fees" at RPC 1.5. RPC 1.5 states as follows:

> RPC 1.5 Fees
>
> **(a)** A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; (8) whether the fee is fixed or contingent.

Thus, the assessment of a "reasonable fee" requires an analysis of the factors enunciated in this rule. In Re Estate of F.W. supra.

In In Re Estate of F.W., supra., the court observed that the contingent fee agreement created a unique relationship between the attorney and client. Id. Contingent fee agreements permit injured parties, who are otherwise unable to pay for legal services, the ability to assert their rights through competent legal counsel. Further, the attorney prosecuting the claim runs the risk that he or she will receive nothing if there is no recovery, no matter how diligent and accomplished the representation. All the factors set forth in RPC 1.5 should be considered without exclusive emphasis on any one.

9

**Factor 1:     The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.**

This lawsuit was a significant undertaking. Initially, Stark & Stark was retained by Jeff and Kelleigh, on March 8, 2014.  Bryan M. Roberts, Esquire, and a former Shareholder at Stark & Stark drove to St. Joseph's Hospital in Paterson, New Jersey to meet with Kelleigh and help her through the frightening and confusing time immediately after Jeff's horrible injury.  Jeff and Kelleigh were referred to Stark & Stark by Jack Kolpen, Esquire, of the law firm of Fox Rothschild.  Due to the complexity of all of the issues involved in this case and the vigor with which it was defended, it took over four years to reach resolution.

Counsel conducted an exhaustive liability investigation following this tragic incident.  Mr. Roberts spent significant time speaking with the investigating Detective at the Ramsey Police Department, Brad Smith.  Counsel drafted and served preservation letters on all potential defendants in this matter and scheduled inspections of the Adirondack Trailways bus and the Lexus.  Stark & Stark hired a leading automotive/mechanical engineer and former automotive mechanic, R. Scott King of DJS Associates in Abington, Pennsylvania, to act as the liability expert in the case and conduct an inspection of the Lexus.

Mr. Roberts and a professional photographer travelled to Hurley, New York to inspect and document the Adirondack Trailways bus involved in the incident, on May 14, 2014.  During this time, Mr. Roberts and his paralegal spent a substantial amount of time analyzing Jeff and Kelleigh's medical and disability benefits and assisted them in obtaining same.  Due to the fact that Jeff had access to medical benefits from the bus, his New York automobile insurance and his health insurance, the coordination of these benefits was a significant undertaking.  Furthermore, the firm spent considerable time analyzing Jeff's potential sources of lost wage benefits and assisted in the securement of same.  On June 2, 2014, Mr. Roberts drove to Rosendale, New

10

York, where the plaintiffs reside, and spent time with them following Jeff's discharge from the hospital.  Rosendale is a 5 to 6 hour roundtrip drive from Stark & Stark's office in Lawrenceville, New Jersey.

On June 13, 2014, Mr. Roberts travelled to Oakland, New Jersey to conduct an inspection of the Lexus with Plaintiffs' liability expert, Mr. King, and the defense liability expert.  Mr. Roberts hired a videographer to film the inspection, which revealed that the lug nuts on the other tire and wheel assembly that was removed and reinstalled at the dealership were under tightened. Stark & Stark obtained reports and photographs from the Ramsey Police Department who extensively investigated the incident.

Throughout the next year, Stark & Stark spent a significant period of time monitoring Jeff's ongoing treatment for his extensive injuries from a number of different medical providers. During this time, we were frequently communicating with Jeff and Kelleigh. The firm obtained, reviewed and summarized thousands of pages of medical records.  In addition, the firm continually monitored Jeff's medical bills and ensured that they were being properly processed and paid by his insurance companies.  Furthermore, the firm assisted with paperwork and issues that developed with Jeff's lost wage benefits, including his short term and long term disability benefits.

In 2015, we retained world-renowned Neuropsychologist, Dr. Wayne Gordon, to perform a neuropsychological evaluation of Jeff.  Dr. Gordon is the Vice Chair of the Department of Rehabilitation Medicine at the Icahn School of Medicine at Mount Sinai and he is also Mount Sinai's Chief of the Rehabilitation Psychology and Neuropsychology services.  Based upon the results of Dr. Gordon's neuropsychological evaluation, Jeff was found to be permanently disabled and unable to work.  As a result of Dr. Gordon's testing and opinions, we retained

11

Stanford University educated and Palo Alto, California-based forensic economist, Robert W. Johnson, to quantify Jeff's economic loss. During this time, we began monitoring a case filed in Federal Court by the bus driver, who was also injured in this incident, and we consulted with the plaintiffs' attorneys in that action. We obtained and analyzed the pleadings, fact discovery and expert discovery in the companion case. Finally, before filing our Complaint, we retained the services of Dr. Harvey Jacobs, an esteemed Life Care Planner from Virginia who focuses on cases involving traumatic brain injuries. We continued to stay in close communication with Jeff and Kelleigh during this time and made the 5 to 6 hour roundtrip drive to visit with them at their home several times.

After assembling our liability and damages experts, we filed a Complaint in this Court on March 11, 2016. Counsel propounded extensive written discovery on the defendants and answered extensive discovery requests. Due to severity of Jeff's injuries, his extensive treatment and his limited stamina, answering written discovery was an involved, time consuming process. Over the next year, several rounds of discovery were exchanged and Plaintiffs' produced an Economic Loss Report from Robert W. Johnson, a Liability Report from R. Scott King, a Life Care Plan from Dr. Jacobs, a Neuropsychological Report from Dr. Gordon, a Psychological Report from Dr. Sanducci and voluminous treatment records. In addition, we worked with Jeff and Kelleigh to obtain photographs of Jeff doing the things that he loved before the incident as well as photographs of Jeff and Kelleigh together. Again, we continued to stay in close communication with Jeff and Kelleigh during this time and made the 6 hour roundtrip drive to visit with them at their home several times.

In late 2017, the defendants scheduled Jeff and Kelleigh's depositions. Due to Jeff's stamina issues, we agreed to present Jeff for deposition on multiple occasions for short periods of

time.  Counsel conducted several in-person deposition preparation meetings with Jeff and Kelleigh.  Part one of Jeff's deposition, and the entirety of Kelleigh's deposition, were completed on September 12, 2017.  The second part of Jeff's deposition was completed on September 20, 2017.  The third, and final, part of Jeff's deposition was conducted on September 21, 2017.

Discovery continued throughout the beginning part of 2018 and Jeff submitted to a defense medical examination with Dr. Benoff, a neuropsychologist.  Counsel consulted with our treating physicians and experts concerning Dr. Benoff's reports and served responses to same.  In addition, counsel was able to locate a freelance photographer that was at the scene of the incident and took a number of compelling photographs of the scene, the bus and Jeff.  Counsel was able to purchase these photographs and make them a part of the case.  In addition, counsel obtained and analyzed the Pretrial materials in the bus driver's Federal Court case, which was resolved in the fall of 2017.  Finally, counsel consulted with a visual litigation strategy firm in Centennial, Colorado, High Impact, to create demonstrative exhibits illustrating Jeff's facial fractures and brain bleeds using MRI films that were colorized and labeled.  Similar to many survivors of traumatic brain injuries, Jeff did not "look injured."  Consequently, we needed to develop demonstrative exhibits that showed and explained Jeff's internal head and facial injuries.  Over several months, counsel collaborated with the visual strategists to develop compelling illustrations of Jeff's injuries.

Following a case management conference with Judge Waldor in April of 2018, the parties agreed to mediate the case with the Honorable Joel B. Rosen, (Ret.), a former United States Magistrate Judge.  The Mediation was scheduled to take place over 2 days, if necessary, on September 26th and 27th.  In advance of the Mediation, counsel prepared an extensive, 300+ page Mediation Statement that was submitted to defense counsel, the defendants' insurance companies

4813-4882-6234, v. 1

and Judge Rosen.  Counsel also arranged for Forge Consulting, a Georgia-based settlement planning group, to attend the Mediation and answer Jeff and Kelleigh's questions about things such as Medicare benefits, liens, settlement structures, asset protection, investments and estate planning.  Before the Mediation, counsel discussed Stark & Stark's fee with Jeff and Kelleigh. To Jeff and Kelleigh's satisfaction, Stark & Stark agreed to seek only 20% on the amount of money recovered over $2,000,000.00, if the matter settled at Mediation.  After a full day of negotiating, and with Judge Rosen's invaluable assistance, the parties agreed to settle the matter for a substantial sum of money.

In the 4+ years that Stark & Stark handled this matter, two Certified Civil Trial Attorneys, John A. Sakson, Esquire, and Bryan M. Roberts, Esquire, as well as numerous paralegals and legal secretaries spent an extraordinary amount of time investigating, developing and litigating the case.  Without these efforts and the time spent travelling to visit and bond with the clients, such an extraordinary result would not have been achieved.  Despite the fact that Jeff will never return to work, the successful resolution of this case has secured Jeff and Kelleigh's financial future.

**Factor 2:      The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer**

The acceptance of the case by Stark & Stark did not preclude the law firm or its attorneys from other employment and, to that extent, this factor is not relevant.  However, it is relevant to the extent that Stark & Stark made a commitment of two experienced Certified Civil Trial attorneys' time to this matter, and that commitment meant that the attorneys were unable or unavailable to work on other matters, or to produce other fees for the law firm.  Herein lies the fundamental philosophical underpinning of the contingency fee concept: a law firm (or individual attorney) commits time and resources to the pursuit of a claim, without any promise of

14

payment or compensation from the party on whose behalf they are prosecuting the claim, with the understanding that the attorney will share in the fruits of the recovery if the attorney's efforts are successful. While the Court may not be in a position to make these observations, Stark & Stark has seen both the good and the bad side of such commitments, and has experienced the economic hardship that comes as a result of a lengthy, costly and unsuccessful contingency fee case. It is a reality of the contingency fee practice that not all claims are successful. In the instant matter, the efforts of Stark & Stark's attorneys are certainly deserving of a reasonable fee which recognizes the risk of devoting time and effort to a well defended claim.

**Factor 3:     The fee customarily charged in the locality for similar legal services**

Stark & Stark is familiar with fee applications on net proceeds in excess of two million dollars in general.  Our law firm has made a number of applications pursuant to Rule 1:21-7 in which we petitioned the Court to set a reasonable fee on net settlement proceeds in excess of the amounts set forth in the Fee Schedule contained in the Court Rule.  Additional information on each of these cases, including case name, Docket Number and the Judge setting the fee, will be provided upon request. Some of these matters are subject to confidentiality agreements, and for that reason, the only information set forth is the amount of the recovery, the County in which the case was venued, and the percentage of fee awarded on the net settlement proceeds in excess of the schedule. For the purposes of comparison, only cases which were resolved by settlement, rather than verdict, have been identified. These cases include the following:

| Gross Settlement | County | Fee Percentage in Excess of Schedule |
|---|---|---|
| $ 15,900,000.00 | Burlington | 24% |
| $ 9,000,000.00 | Federal Court | 25% |
| $ 6,600,000.00 | Mercer | 25%* |
| $ 6,250,000.00 | Somerset | 25% |
| $ 3,800,000.00 | Mercer | 25%** |
| $ 3,765,000.00 | Middlesex | 25% |
| $ 3,500,000.00 | Mercer | 25% |
| $ 3,400,000.00 | Mercer | 25% |
| $ 3,235,000.00 | Mercer | 25%** |
| $ 3,100,000.00 | Mercer | 25% |
| $ 3,050,000.00 | Mercer | 20% |
| $ 2,875,000.00 | Federal Court | 25% |
| $ 2,800,000.00 | Mercer | 33% |
| $ 2,750,000.00 | Middlesex | 20% |
| $ 2,500,000.00 | Mercer | 25% |
| $ 2,100,000.00 | Morris | 33% |
| $ 3,235,000.00 | Mercer | 25%** |
| $ 2,875,000.00 | Federal Court | 25% |

*  Plaintiff was a minor
**Plaintiff was incompetent

It has been the undersigned's personal experience that the usual fee awarded on net settlement proceeds in excess of the Fee Schedule amount is 25%.  We have been involved in several cases in which a greater fee was awarded, but it is unusual in my experience to have a fee significantly below 25% awarded.

16

**Factor 4:     The amount involved and the results obtained**

The total amount of settlement dollars obtained on the plaintiffs' behalf requires that the instant motion to set the attorney's fees be filed.  The exact amount is provided in the Certification of Bryan M. Roberts, Esquire, which is filed under seal.

**Factor 5:     The time limitations imposed by the client or by the circumstances**

This case did not present significant time limitations and therefore is not a relevant factor.

**Factor 6:     The nature and length of the professional relationship with the client**

Stark & Stark, John A. Sakson, Esquire, and Bryan M. Roberts, Esquire, represented Jeff and Kelleigh for over 4 years and they could not be happier with the result of our representation. Stark & Stark has gone above and beyond to do what was necessary to assist Jeff and Kelleigh during this difficult time in their lives. Stark & Stark expended approximately $90,000.00 in costs to prepare the case.  The firm devoted whatever resources were necessary to ensure that Jeff and Kelleigh received accurate, timely answers to their questions and concerns.  Despite the geographic distance between Stark & Stark and Jeff and Kelleigh's home, we made several visits to them each year so that we could interact face-to-face.

**Factor 7:     The experience, reputation, and ability of the lawyer or lawyers performing the services**

The lawyers who devoted the greatest amounts of time and effort to this case were John A. Sakson, Esquire, and Bryan M. Roberts, Esquire.  Mr. Roberts sets forth Mr. Sakson's professional accomplishments as well as his own in his Certification and those details will not be repeated herein at any length.  It is important to remember that Jeff and Kelleigh were referred to the firm by Mr. Kolpen due to our expertise in representing catastrophically injured individuals, our reputation and our resources.

**Factor 8:     Whether the fee is fixed or contingent**

The fee in this case was a pure contingency fee, which meant that the plaintiffs' attorneys would not receive a penny of compensation if they were not successful in prosecuting their client's claim. A significant amount of time was devoted to this case, and it is obvious and axiomatic that the attorneys who were expending that effort on this case were not available to work on other matters or earn fees for the law firm in other cases.  This concept of "lost opportunity" is one of the factors which persuasively argues for a contingent fee which reflects the actual risk undertaken by the contingent fee attorney's law firm. The arguments set forth under the other enumerated factors will not be repeated in this paragraph, but the evidence is clear that Stark & Stark made a commitment of time, resources and money, to a case with risk, and litigated the matter aggressively and successfully, in order to earn a hard-fought resolution of the case which exceeded our clients' hopes and expectations.

## CONCLUSION

For all the reasons set forth in this letter memorandum, and in the Certification of counsel, it is respectfully submitted that a reasonable fee for the highly successful efforts of Stark & Stark is a fee of 20% on the net proceeds in excess of two million dollars.

Respectfully submitted,

s/John A. Sakson

_____

JOHN A. SAKSON (JS 0630)
BRYAN M. ROBERTS (BR 5505)
STARK & STARK
P.O. Box 5315
Princeton, NJ  08543
(609) 896-9060
jsakson@stark-stark.com
broberts@stark-stark.com

Dated: November 9, 2018

18

4813-4882-6234, v. 1